**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| OVERHEAD DOOR CORPORATION and GMI HOLDINGS INC., | § § § | Case No. |
| *Plaintiff*, | § § | |
| v. | § § | |
| THE CHAMBERLAIN GROUP, INC. | § § | |
| *Defendant*. | § § | |

## COMPLAINT

Plaintiff Overhead Door Corporation ("Overhead Door") and GMI Holdings Inc. ("The Genie Company") (collectively, "Plaintiffs" or "Overhead Door Group") file this Complaint against The Chamberlain Group, Inc. ("Defendant" or "Chamberlain") and allege as follows:

## PARTIES

1.      Plaintiff Overhead Door is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business at 2501 South State Highway 121, Suite 200, Lewisville, TX 75067.

2.      Plaintiff GMI Holdings Inc. is a Delaware corporation, with its principal place of business at One Door Drive, Mount Hope, OH 44660.

3.      Chamberlain is a Delaware corporation with its principal place of business at 300 Windsor Drive, Oak Brook, IL 60523.

## NATURE OF THE ACTION

4.      This is a civil action for infringement pursuant to Patent Laws of the United States, 35 U.S.C. §§ 100 *et* seq.  Chamberlain directly infringes, contributorily infringes, and/or induces

the infringement of U.S. Patent Nos. 9,483,935 (the "'935 Patent"); 8,970,345 (the "'345 Patent"); 7,173,516 (the "'516 Patent"); 7,180,260 (the "'260 Patent"); 7,315,143 (the "'143 Patent"); 7,143,804 (the "'804 Patent"); 7,956,718 (the "'718 Patent"); and 8,410,895 (collectively the "Asserted Patents").

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Chamberlain for at least the following reasons: (i) Chamberlain has committed acts of patent infringement and/or contributed to or induced acts of patent infringement by others in this District and continues to do so; (ii) Chamberlain regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in this District and in this State; and (iii) Chamberlain has purposefully established substantial, systematic and continuous contacts with this District and expects or should reasonably expect to be subjected to this Court's jurisdiction.

7.      Venue is proper in this district under 28 U.S.C. §§ 1391(c) and 1400(b).  Defendant has a regular and established place of business in this district, has transacted business in this district, and has committed, contributed to the commitment of, and induced acts of patent infringement in this District.  Defendant has a regular and established place of business in this district: it operates a distribution facility in Irving, Texas, from which it distributes many of the Accused Products, including the LiftMaster™ line of garage door opener systems, to customers in the Northern District of Texas and/or other districts.  *See* **Exhibit 9** (photographs of Liftmaster distribution center located in Irving, Texas).

## FACTUAL BACKGROUND

8.      In 1921, Overhead Door Corporation's founder C.G. Johnson invented the first upward acting garage door and secured patent protection for his invention with U.S. Pat. No. 1,508,886.  Partnering with attorney Forest Mckee of Hartford City, Indiana, the company started its first plant in Detroit, a 1,000 sq. ft. building with a production capacity of one door per day. After acquiring his first patent, C.G. Johnson and his wife spent the next few years touring the Country with a miniature upward-acting garage door mounted on the back of a Model T Ford truck signing up distributors.

9.      In 1924 the factory moved to Hartford City, Indiana, with a new plant of 200,000 sq. ft. of manufacturing space allowing mass production of upward-acting garage doors.  Three years later, Johnson invented the first electric garage door opener and patented it as U.S. Pat. No. 1,621,669.  Together with his partner Herbert Cady Blodgett, they formed the Door Control Company in Hartford City, Indiana, later adopting the name Overhead Door Company of Hartford City.

10.      Overhead Door continued to expand through the years.  In 1970, Overhead Door moved into the automatic sliding door and sliding window markets by acquiring Horton Automatics in Corpus Christi, Texas.  And in 1994, Overhead Door Corporation purchased Genie Home Products.  Originally founded in 1923 as Alliance Manufacturing Company, located in Alliance, Ohio, the Genie Company is now headquartered in Mt. Hope, Ohio, and distributes its openers & accessories through dealers and retailers throughout the United States and Canada.  In 2009, Overhead Door Corporation continued its expansion by purchasing Wayne-Dalton's residential and commercial door business.  This transaction created the largest manufacturer, marketer, and distributor of residential and commercial upward acting doors and operators in North

America.  Currently, with its nationwide network of more than 450 authorized Ribbon Distributors, Overhead Door is a leading provider of garage door systems.

11.     More than 95 years since Mr. Johnson's development, Overhead Door is continuing his legacy of innovation.  Overhead Door has invested and continues to invest significantly in research and development, building a comprehensive portfolio of over 700 patents worldwide.  In the last four years alone, Overhead Door has invested over $70 million into research and development.

12.     Overhead Door's investment in innovation has been recognized in the field repeatedly.  For example, in 2019, the Overhead Door brand was conferred with the Women's Choice Award® by WomenCertified® for America's Most Recommended National Garage Door Brand, marking the *eighth* consecutive year Overhead Door has received this recognition.  In 2018, nearly 1,000 U.S. builders, developers, and contractors voted the Overhead Door brand as the garage door brand with the highest brand familiarity and the brand used most, according to the 2018 BUILDER Brand Use Study, marking the *seventh* consecutive year Overhead Door has received this recognition.

13.     Among the groundbreaking technologies in Overhead Door's products is the patented Auto Seek Dual Frequency technology.  Overhead Door's patented Auto Seek Dual Frequency system improves the likelihood of successful reception of a garage door actuation message between a garage door opener transmitter and a barrier operator receiver by mitigating the effects of RF (radio frequency) interference.  Unlike prior remote controlled barrier operating systems, Overhead Door's patented Auto Seek Dual Frequency technology transmits data packets on multiple frequencies, asynchronously switching frequencies at both the transmitter and receiver, to avoid potential noise and interference on any individual frequency.

14.     The Genie Company has also routinely been recognized as a leader in innovation. For instance, in 2016, The Genie Company was awarded an IoT (Internet of Things) Evolution Connected Home and Building Award for its Aladdin Connect smart device.  The Evolution Connected Home and Building Award honors organizations delivering software and hardware solutions which enable the advancement of the smart home and building industry.  The Aladdin Connect system improves both the safety and convenience of the conventional barrier operating systems by allowing two-way communication between the garage door operator and the user through a wireless network and its associated patent protection involves an improvement with regard to energy efficient operation.

15.     In addition to Overhead Door's revolutionary advancements in multi-channel garage door systems and wireless interfacing, Overhead Door has continually improved the safety, security, and usability of their garage door systems, adding capabilities like it's Sure-Lock™ feature which allows a user to lock-out the keypad and remotes for extra security at night or while a user is away from their dwelling, as well as Overhead Door's auto-close feature, which closes the garage door after a pre-determined time, and Overhead Door's force limit adjustment safety feature, which requires the user to set force limit values once safety sensors are installed and detected.

16.     Overhead Door's recognition as a leader in innovation, quality, and dependability occurred through significant investments in domestic support and manufacturing.  Starting as a small 1,000 sq. ft. plant in Detroit with a capacity of one door per day, Overhead Door has invested significantly over the past century in expanding its manufacturing and support facilities, including a 125,000 sq. ft. facility in Corpus Christi, Texas.

17.     Overhead Door's manufacturing facilities are supported by additional facilities for research, development, sales, and design enablement located throughout the country. These offices include administrative facilities in Lewisville, Texas, Corpus Christi, Texas, and Dallas, Texas.

18.     Overhead Door's patented technologies provide concrete, technical solutions to real-world problems. One example is Overhead Door's patented Auto Seek Dual Frequency technology, which has been included as a standard feature across all Overhead Door models since 2009, and embodies the '935 and '345 Patents (the "Auto Seek Dual Frequency Patents"). The Auto Seek Dual Frequency Patents are a technological improvement to moveable barrier communication systems – it "improves transmission efficiency between transmitters and receivers by mitigating the effects of RF interference." *See, e.g*., **Exhibit 1**, '935 Patent at 3:59-61.

19.     Prior to the Auto Seek Dual Frequency Patents, conventional barrier operator systems primarily utilized single channel transmitters. These single frequency transmitters used FCC (Federal Communication Commission) unlicensed frequency bands, which were also used by a wide array of other types of unlicensed radios, and resulted in substantial in-channel noise and interference. Traditionally, such RF transmitters, upon actuation by the user, would send access codes and commands to a radio frequency receiver associated with the barrier operator on one frequency band. *See, e.g*., '935 Patent at 1:34-36. A controller unit also associated with the barrier operator then received and decoded the data from the RF receiver, and upon verifying the access codes would then open, close, or stop the barrier, depending upon the command. *See, e.g*., '935 Patent at 1:34-41.

20.     To avoid unauthorized access, conventional barrier operator systems used code-hopping encryption over a single channel, sometimes referred to as "rolling codes." *See, e.g*., '935

Patent at 1:42-46.  In these conventional barrier operators, the rolling code is transmitted as part of the packet data along a single fixed RF "channel."  *See, e.g*., '935 Patent at 1:46-47.  The rolling code changes with each new transmission in accordance with a stored algorithm to prevent unauthorized capture of the codes, its security dependent upon the secrecy of the encryption algorithm and of the secret key.  *See, e.g*., '935 Patent at 1:54-57.

21.     Because such RF transmissions traditionally were sent on a fixed, single RF channel, RF noise in the channel causes reduced reception range, and the transmitter had to be actuated often, and the packet data repeatedly transmitted, for extended periods of time to ensure the data was received.  *See, e.g*.,'935 Patent, at 1:67-2:4.  If the channel has heavy interference, then reception was completely blocked and the wireless system was broken down as the code-hopping scheme could not mitigate RF noise in the channel.  *See, e.g*.,'935 Patent, at 2:4-7.

22.     The moveable barrier industry has long recognized this problem.  For example, The Door & Access Systems Manufacturers Association International (DASMA), which helps develop standards for the moveable barrier industry, published a troubleshooting guide in 2005 detailing the problems with wireless door and gate operator communication systems.  *See* **Exhibit 10,** Door and Gate Operator Remote Control Troubleshooting Guide, DASMA (May 12, 2005), available at https://www.dasma.com/PDF/Publications /TechDataSheets/ OperatorElectronics/TDS374.pdf.

23.     In the guide, DASMA explained "[w]ireless door and gate operator control systems are susceptible to a variety of external influences that can result in poor performance."  *Id*.  The guide goes on to explain that the most common causes of poor remote control transmitter performance was RF interference from LED light bulbs, security and communication systems, commercial radio and TV transmitters, and military Land Mobile Radio (LMR) systems.  *Id.* Unfortunately, these issues were often difficult to solve, requiring the user to either purchase a

new garage door operating system entirely, or purchase a retrofit package to allow for operation on a frequency that is less susceptible to interference in the area. *Id.*

24. These unreliable home access issues were particularly concerning for those living near military bases. Notably, in the 2000s, the military supplied new radio systems to roughly 125 bases that use the same frequency as the one relied upon by more than 90% of the remotely operated garage-door openers (390 MHz). *See* **Exhibit 11**, John J. Lumpkin, *Military Jams Garage Doors Openers John J. Lumpkin*, CBS News (December 6, 2004), available at https://www.cbsnews.com/news/military-jams-garage-doors-openers/. That rollout placed an estimated at least 50-million garage-door openers in the United States at risk of interference from the new military radios. *Id*. The conventional approach led to situations in which scores of homeowners were effectively locked out of their homes by interference issues. *See* **Exhibit 12**, Christie Ethridge, *New Radio Frequency at Fort Gordon Causing Garage Door Problems*, WRDW News (June 12, 2013) ("Electronic testing at Fort Gordon has some people locked out of their homes. The post is transitioning to a new land mobile radio system that operates on the same frequency as many garage door openers in the area, leaving some people stranded outside when their remotes won't work.").

25. The potential for such interference persists to this day as such problems occurred in Virginia in late 2019:

> To address homeland defense needs and comply with government direction that agencies use the electromagnetic spectrum more efficiently, the Department of Defense (DoD) is deploying new land mobile radios to installation across the country," the statement reads.
>
> The radios "operate in the same frequency range . . . as many unlicensed, low-powered garage door openers, which have operated in this range for years," the training center said.

> Authorized to use that frequency range for "several decades," the defense department's deployment of land mobile radios "is relatively new," according to the training center.
>
> As a result, "some users of garage door openers have experienced varying levels of inoperability that has been attributed to interference caused by the new radios.

*See* **Exhibit 13**, Don Del Rosso, *Feds Admit Radios Interfere With Garage Door Openers* (November 5, 2019), available at https://www.fauquiernow.com/fauquier_news/article/fauquier-feds-admit-radios-interfere-with-garage-door-openers-11-5-2019; *see also* **Exhibit 14**, Peter Dockrill, *Car Keys Mysteriously Stopped Working in this Small Ohio Town,* Science Alert (May 7, 2019), available at https://www.sciencealert.com/a-strange-mystery-of-doors-that-wouldn-t-open-in-ohio-has-finally-been-solved ("A perplexing riddle affecting dozens of families in the Cleveland area has finally been solved, but not before weeks of wreaking havoc on people who – bizarre as it sounds – were unable to open their car and garage doors.  In late April, residents of the town of North Olmsted, Ohio began finding that their wireless car key fobs and garage door openers had simply ceased to function, or worked unpredictably when they did work at all.").

26.     As discussed above, this RF interference problem associated with barrier operating systems arose due to various technological changes which resulted from the expanded use of garage door openers using RF remote devices for operation, the utilization of LMR in various locales, increased utilization of RF-interfering electronic items in or near garage doors, and other mechanisms of interference with the RF frequencies utilized by various civilian and military devices.  The Auto Seek Dual Frequency Patents provide specific solutions to this technical problem associated with barrier operating systems by disclosing a remote controlled barrier operating system that transmits data packets along asynchronously switched frequencies between the transmitter and receiver.  The result is a system that combines the noise immunity and narrow

band interference immunity of frequency hopping with rolling code security to provide a secure, interference free communications system.

27.     Overhead Door has continually improved the security and usability of their garage door systems, adding capabilities like its Sure Lock™ feature which allows a user to lock-out the keypad and remotes for extra security at night or while on vacation, as well as Overhead Door's auto-close feature, which closes the garage door after a pre-determined time.  The need for these security features continues to be apparent, as thieves have continued to look for new ways to break into garage doors by hacking the barrier operating system.  *See* **Exhibit 15**, *Police warn about hackers who break into garage doors*, Climate Online Redwood City (May 14, 2018), available at https://climaterwc.com/2018/05/14/redwood-city-police-warn-about-hackers-who-break-into-garage-doors/ ("While on vacation or away from home for extended periods of time, unplug the garage door opener unit or use a vacation lock on the wall console switch, which is an optional accessory on some garage door openers."); *see also* **Exhibit 16**, *How to Hack a Garage Door in Under 10 Seconds and What You Can Do About It*, Imminent Threat Solutions (June 10, 2015), available at https://www.itstactical.com/intellicom/physical-security/how-to-hack-a-garage-door-in-under-10-seconds-and-what-you-can-do-about-it/ ("Older models from vendors such as Chamberlain and LiftMaster can also be vulnerable so you should double check to ensure that your door does not feature this technology.").  Overhead Door's Sure-Lock™ and auto-close features help prevent these unauthorized hacking attempts by ensuring the garage door is not left open and that hackers cannot remotely operate the system while the owner is away.

28.     Another technological problem created by conventional garage door openers is another vulnerability to break-in occasioned by forgetting to close the door when leaving, or attempting to do so and failing.  Such a problem does not exist when a door has to be closed

manually.  As one industry source notes, an automatic door closing feature is "the ultimate way to prevent break-ins."  *https://www.futurehorizons.net/best-automatic-garage-door-closer-to-buy*. Thus:

> With all the issues that people encounter on a daily basis, it's easy to forget simple activities such as closing your garage door. If you often use your garage as a storage unit, leaving this door open can compromise the security of your entire home. But instead of panicking, take advantage of the best **automatic garage door closer when you forget** to close your garage door. This device is designed to automatically shut your garage door after a pre-determined period of time.

*Id*.

29.     The '516 and/or '143 Patents address these risks created by the technology associated with conventional electronic GDOs, as they recite the inclusion of both features.  Those capabilities are paired with Overhead Door's ergonomic design to prevent accidentally pressing the wrong button.  Overhead Door markets products that embody Overhead Door's '516 and/or '143 Patents.

30.     Plaintiffs own all rights, titles, and interests in and to the Asserted Patents.  The Asserted Patents are valid and enforceable.

31.     Defendant Chamberlain is a competing supplier of garage door operators and supporting components.  Chamberlain designs, develops, manufactures, sells, imports into the United States, and sells garage door operators and supporting components after importation into the United States for use and distribution by Chamberlain's customers.

32.     Chamberlain directly infringes at least claim 1 of the '935 Patent, claim 1 of the '345 Patent, claim 10 of the '516 Patent, claim 1 of the '260 Patent, claim 2 of the '143 Patent, claim 1 of the '804 Patent, claim 18 of the '718 Patent, and claim 17 of the '895 Patent (collectively "the Asserted Claims"), by acting without authority to make, have made, use, offer to sell, sell

within the United States, or import into the United States, infringing Chamberlain's LiftMaster™ and Chamberlain™ brand garage door openers, as well as garage door opener products made by Chamberlain under the Raynor™ and Craftsman™ brands (collectively, the "Accused Products").

33.    Chamberlain also induces, and continues to induce, infringement of the Asserted Patents with the specific intent that these acts infringe the Asserted Patents.  Chamberlain actively induces others to infringe one or more of the Asserted Claims through their sale of the Accused Products to customers in the United States.  Chamberlain encourages and facilitates the infringement of the Asserted Patents by offering and distributing directions, demonstrations, guides, manuals, training for use, and other materials with the Accused Products that encourage the infringing use of the Accused Products.

34.    Chamberlain induced such infringing acts and knew or should have known that their actions would induce actual infringement of the Asserted Patents.  Upon information and belief, Chamberlain had actual notice of the Asserted Patents prior to the commencement of the instant litigation.

35.    Plaintiffs and Defendant are direct competitors, and Plaintiffs have provided public notice that their products are patent protected.  *See, e.g.*, **Exhibit 17**, Genie Patent Marking List, available at https://web.archive.org/web/20190616134226/http://geniecompany.com/data/genie-company_patents-by-model.pdf.  Indeed, many of Chamberlain's own patents cite to Plaintiffs' patents as prior art.  *See, e.g.*, U.S. Patent No. 10,126,737 (assigned to Chamberlain and citing U.S. Patent Application Publication No. 2006/0132284, which issued as U.S. Patent No. 7,956,718 and is assigned to Overhead Door); U.S. Patent No. 9,122,254 (assigned to Chamberlain and citing 7,194,412, which is assigned to Overhead Door); U.S. Patent No. 8,648,695 (assigned to Chamberlain and citing U.S. Patent No. 7,956,718, which is assigned to Overhead Door); U.S.

Patent No. 10,652,743 and citing U.S. Patent No. 8,581,695, assigned to Overhead Door Corp. and related to the '935 and '345 Patents). And Chamberlain has notice of the Asserted Patents at least as of the service of this Complaint, including **Exhibits 18-26** explaining how Chamberlain infringed and/or induced its customers and users to infringe the Asserted Patents.

36.    Chamberlain also contributorily infringes certain Asserted Claims through its sale and offers to sell within the United States and/or import into the United States components of the Accused Products, constituting a material part of the Asserted Claims, knowing the same to be especially made or especially adapted for use in an infringement of the Asserted Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use. For example, on information and belief, the Accused Products and/or components thereof are specifically designed for garage door opener operating systems. Due to their specific designs, the Accused Products and/or components thereof do not have any substantial non-infringing uses.

37.    Chamberlain sells the Accused Products with the knowledge that the devices infringe. Chamberlain has actual notice of the Asserted Patents at least as of the filing of this Complaint.

**CLAIM 1 - INFRINGEMENT OF U.S. PATENT NO. 9,483,935**

38.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 37 above as if specifically set forth herein.

39.    The '935 Patent is entitled "Channel-Switching Remote Controlled Barrier Opening System," issued on November 1, 2016, to inventors Grant B. Carlson and Brett A. Reed. The '935 Patent expires on May 16, 2031. The '935 Patent issued from U.S. Patent App. Ser. No. 14/614,193, filed on February 5, 2015, and was previously published as U.S. Patent Pub. No.

2015/0179059 on June 25, 2015.  The '935 Patent claims priority to U.S. Patent App. Ser. No. 12/473,083, filed May 27, 2009.

40.     A copy of the '935 Patent is attached as **Exhibit 1**.

41.     Overhead Door Corporation is the owner, by valid assignment, of the entire right, title, and interest in and to the '935 Patent.  The assignment is recorded at the United States Patent and Trademark Office at Reel/Frame 034901/0561.  The '935 Patent is valid, enforceable, and is currently in full force and effect.

42.     Prior to the '935 Patent, conventional barrier operator systems were subject to RF interference, particularly from radios used by the military.  The patent explains, for example, that if "the channel has heavy interference, then reception is completely blocked and the wireless system breaks down as the code-hopping scheme cannot mitigate RF noise in the channel."  '935 Patent at 2:4-7.  As such, there was "a need for a better system of wireless code communication, preferably for code hopping transmissions, to improve reception, security, and operation of barrier operator systems, that does not incur the disadvantages associated with single channel RF transmission."  '935 Patent at 2:7-13.

43.     The claimed inventions of the '935 Patent technologically improve barrier operator system communications by providing a robust communication system that can overcome potential interference.  They do so by, *inter alia*, utilizing "channel switching," where "data packets are transmitted along alternately switched channels between the transmitter and receiver, to avoid the noise and interference of any one channel."  '935 Patent at 2:16-21.  Thus, the '935 Patent provides specific solutions to technical problems that have arisen specifically with barrier operating systems.

44.     The claims of the '935 Patent further require limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well known or routine.

45.     In claim 1 for instance, the claimed elements in combination are not conventional, well understood, or routine.  For example, claim 1 recites an improved "remote controlled barrier opening system" that requires a transmitter configured to "output frequency to different channels, the switching being performed at a transmitter-switching rate," and on each of the channels, the transmitter must then "transmit multiple copies of a message."  '935 Patent at Claim 1.  Claim 1 further requires a receiver configured to "switch a reception frequency to the different channels at a receiver scan rate that is different from the transmitter-switching rate," and "on each of the channels, receive data for a period of time greater than a transmission time of one copy of the message."  *Id*.  This multi-channel communication represents a technological improvement because it reduces radio frequency interference.  *See, e.g.*, '935 Patent at 2:16-21.

46.     In each claim, the claimed elements in combination result in a particular barrier operating system that is implemented in an unconventional and non-trivial manner, and which require new and technologically improved devices—transmitters and receivers, as demonstrated in Figures 1-3 of the '935 Patent.  The claimed elements are not merely generic barrier operator components, but require an inventive, barrier operator control system that was not standard and could not be purchased off-the-shelf.  These systems were neither well understood nor routine.  Each claim combines the claimed elements in an unconventional way to provide specific technological solutions to technology-specific problems related to unauthorized access and signal interference.

47.     Even Chamberlain has recognized the benefits provided by systems practicing one or more claims of the '935 Patent.  Chamberlain's troubleshooting website discusses potential problems with interference, stating that interference can come from "almost anything that is plugged into an electrical outlet or uses a battery."  *See* **Exhibit 27,** Chamberlain Group Support – Remote Controls Only Work Close To The Garage Door Opener, available at https://support.chamberlaingroup.com/s/article/Remote-controls-only-work-close-to-the-garage-door-opener-1484145692760.  As Chamberlain's troubleshooting guide explains, "[t]he 888LM, 889LM or 041A7928-3 door control panels have Security+ 2.0® technology and features a narrow band of accessories which transmits on 310 MHz, 315 MHz and 390 MHz, virtually eliminating interference."  *Id*.  And, Chamberlain's "Garage Door Opener Comparison" sheet shows the "Security+ 2.0®" multi-frequency feature is now used in *all* of Chamberlain's operator systems. *See* **Exhibit 28,** Garage Door Opener Comparison.  Chamberlain promotes features associated with its sale of devices that practice one or more claims of the '935 Patent.  For example, Chamberlain advertises that its infringing "Security+ 2.0®" technology safeguards access with an encrypted tri-band signal to virtually *eliminate interference* and offer extended range."  *See, e.g*., **Exhibit     29,** LiftMaster™     HCTDCUL     Product     Spotlight,     available     at https://www.LiftMaster.com/architect-resource-center/HCTDCUL_Spotlight.

48.     Chamberlain has directly infringed at least claim 1 of the '935 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.  The infringing products include, but are not limited to, LiftMaster™ 8550 WLB receiver with KLCK3U and 953ESTD transmitters.  The infringement remains ongoing.

49.     Attached hereto as **Exhibit 18** is an exemplary claim chart detailing representative infringement of claim 1 of the '935 Patent by Chamberlain.

50.     In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the '935 Patent.

51.     As a consequence of Chamberlain's infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

52.     On information and belief, Chamberlain's infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the '935 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement.

## CLAIM 2 - INFRINGEMENT OF U.S. PATENT NO. 8,970,345

53.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 52 above as if specifically set forth herein.

54.     The '345 Patent is entitled "Channel-Switching Remote Controlled Barrier Opening System," issued on March 3, 2015, to inventors Grant B. Carlson and Brett A. Reed.  The '345 Patent expires on May 16, 2031.  The '345 Patent issued from U.S. Patent App. Ser.  No. 14/066,175, filed on October 29, 2013, and was previously published as U.S. Patent Pub. No. 2014/0053466 on February 27, 2014.  The '345 Patent claims priority to U.S. Patent App. Ser. No. 12/473,083, filed May 27, 2009.

55.     A copy of the '345 Patent is attached as **Exhibit 2**.

56.     Overhead Door Corporation is the owner, by valid assignment, of the entire right, title, and interest in and to the '345 Patent.  The assignment is recorded at the United States Patent and Trademark Office at Reel/Frame 031507/0174.  The '345 Patent is valid, enforceable, and is currently in full force and effect.

57.     The '345 Patent generally relates to channel switching communication between a receiver and a transmitter of a barrier operator system.  The specific channel switching system and methods recited in the claims of the '345 Patent are directed at overcoming problems associated with conventional, single-channel systems, which experienced channel interference that could block reception and, in certain instances, lock people out of their homes.  '345 Patent at 2:9-15.

58.     The '345 Patent is the parent of the '935 Patent discussed above, which technologically improves barrier operator systems by providing a robust communication system that can overcome potential interference.  It does so by utilizing "channel switching" where "data packets are transmitted along alternately switched channels between the transmitter and receiver, to avoid the noise and interference of any one channel."  '345 Patent at 2:12-17.  Thus, the '345 Patent provides specific solutions to technical problems that have arisen specifically with barrier operating systems.

59.     The claims of the '345 Patent further require limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well known or routine.

60.     In claim 1 for instance, the claimed elements in combination are not conventional, well understood, or routine.  For example, claim 1 recites an improved "channel switching remote controlled barrier opening system."  '345 Patent at Claim 1.  Each claim requires a transmitter configured to "perform iterative" (repeated) and "sequential" (following a logical sequence) "setting of an output frequency of a transmitter to multiple channels," and the transmitter also "perform[s] transmission of multiple copies of a message before tuning of the transmitter, at a transmitter-switching rate, to a next one of the multiple channels."  '345 Patent at Claim 1.  This technology assists in ensuring data packets are received on each channel by the receiver.  This

represents a technological improvement over then-existing systems because it allows for the use of multiple channels in a more robust manner, which maximizes the probability that data packets to operate the barrier system will be received on at least one channel.

61.     Claim 1 further requires a receiver configured to "perform iterative, sequential setting of a reception frequency of the receiver to the multiple channels at a receiver scan rate that is faster than the transmitter switching rate," and "over each of the multiple channels, receive data for a period of time greater than that required for transmission of exactly one copy of the message." '345 Patent at Claim 1.

62.     The particularized multi-channel communication regimes described in the claims of the '345 Patent represent a technological improvement because it reduces radio frequency interference. *See, e.g.*, '345 Patent at 2:11-17.

63.     In each claim, the claimed elements in combination result in a particular barrier operating system that is implemented in an unconventional and non-trivial manner, and which require new and technologically improved devices—transmitters and receivers, as demonstrated in, for example, Figures 1-3 of the '345 Patent.  The claimed elements are not merely generic barrier operator components, but require an inventive, barrier operator control system that was not standard and could not be purchased off-the-shelf.  These systems were neither well understood nor routine.  Each claim combines the claimed elements in an unconventional way to provide specific technological solutions to technology-specific problems related to unauthorized access and signal interference.

64.     Even Chamberlain has recognized the benefits provided by systems practicing one or more claims of the '345 Patent.  Chamberlain's troubleshooting website discusses potential problems with interference, stating that interference can come from "almost anything that is

plugged into an electrical outlet or uses a battery." *See* **Exhibit 27,** Chamberlain Group Support – Remote Controls Only Work Close To The Garage Door Opener, available at https://support.chamberlaingroup.com/s/article/Remote-controls-only-work-close-to-the-garage-door-opener-1484145692760. As Chamberlain's troubleshooting guide explains, "[t]he 888LM, 889LM or 041A7928-3 door control panels have Security+ 2.0® technology and features a narrow band of accessories which transmits on 310 MHz, 315 MHz and 390 MHz, virtually eliminating interference." *Id.* As shown in Chamberlain's "Accessory Compatibility Chart," Chamberlain began selling its "Security+ 2.0®" multi-frequency systems in 2011, shortly after Overhead Door's Dual Frequency systems were introduced and two years after the filing of the application that led to issuance of the '935 Patent. *See* **Exhibit 30,** Accessory Compatibility Chart, available at https://p.widencdn.net/nkm2rb/CX3131. And, Chamberlain's "Garage Door Opener Comparison" sheet shows the "Security+ 2.0®" multi-frequency feature is now used in *all* of Chamberlain's operator systems. *See* **Exhibit 28,** Garage Door Opener Comparison. Chamberlain promotes features associated with its sale of devices that practice one or more claims of the '935 Patent. For example, Chamberlain advertises that its infringing "Security+ 2.0®" technology safeguards access with an encrypted tri-band signal to virtually *eliminate interference* and offer extended range." *See, e.g*., **Exhibit 29,** LiftMaster™ HCTDCUL Product Spotlight, available at https://www.LiftMaster™.com/architect-resource-center/HCTDCUL_Spotlight.

65.     Chamberlain has directly infringed at least claim 1 of the '345 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271. The infringing products include, but are not limited to, LiftMaster™ 8550 WLB receiver with KLCK3U and 953ESTD transmitters. The infringement remains ongoing.

66.     Attached hereto as **Exhibit 19** is an exemplary claim chart detailing representative infringement of claim 1 of the '345 Patent by Chamberlain.

67.     In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the '345 Patent.

68.     As a consequence of Chamberlain's infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

69.     On information and belief, Chamberlain's infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the '345 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement.

## CLAIM 3 - INFRINGEMENT OF U.S. PATENT NO. 7,173,516

70.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 69 above as if specifically set forth herein.

71.     The '516 Patent is entitled "Operating System For A Motorized Barrier Operator," issued on February 6, 2007, to inventors Willis J. Mullet, David B. Davies, Mikael Backstrom, Eric Wilmot, Keith Alsberg, and James S. Murray.  The '516 Patent expires on September 23, 2024.  The '516 Patent issued from U.S. Patent App. Ser. No. 10/773,479, filed on February 6, 2004, and was previously published as U.S. Patent Pub. No. 2005/0176400 on August 11, 2005.

72.     A copy of the '516 Patent is attached as **Exhibit 3**.

73.     GMI Holdings Inc is the owner, by valid assignment, of the entire right, title, and interest in and to the '516 Patent.  The assignment is recorded at the United States Patent and

Trademark Office at Reel/Frame 031507/0174.  The '516 Patent is valid, enforceable, and is currently in full force and effect.

74.     The '516 Patent generally relates to a barrier operating system which utilizes a multi-functional wall station for a moveable barrier which provides for an auto-close mode for automatically closing a door after a predetermined period of time.  The system may further provide for a blocking mode for preventing remote transmitters from opening a door.  The system may further provide selective concealment of certain switches or buttons which are not commonly used in day-to-day operation of the wall station.  Independent observers note the safety benefits of such technology.  *See* **Exhibit 31,** Kasey Tross, *8 Ways to Keep Thieves Out of Your Garage*, SafeWise.com (Jan. 7, 2020), available at https://www.safewise.com/blog/8-ways-keep-thieves-garage ("An open overhead garage door is an open invitation to burglars" and recommending "an automatic garage door closer" which "will automatically close the garage after a certain amount of time."); *see also* **Exhibit 32,** AA Garage Door, *10 Benefits of an Automatic Garage Door Opener* (August 5, 2016) available at  https://artisandoorworks.com/surprising-benefits-automated-garage-doors/ ("Another feature . . . disables the remote controls.  This means that your garage door can only be opened from the inside.  Opportunistic thieves or burglars won't be able to access your garage or your home even with a remote control code scanner.").

75.     Prior to the '516 Patent, conventional barrier operator systems were deficient because they either failed to provide auto-close and blocking mode capabilities at all, or they included these control elements in different locations, such as the operator itself, rather than the wall control station.  '516 Patent at 4:7-10.  As the patent explains, "[s]ome [controls] are provided at the operator head and some are added on and separate from a main control button or wall station. The add-on devices are susceptible to failure or damage and as such may interfere with the normal

operation of system.  And if the add-on device is in proximity to other devices the possibility of inadvertent button actuation is substantially increased."  '516 Patent at 4:11-14.  And while a few devices did provide some functions in one location, these devices were not user friendly, in that they "cannot be seen in the dark nor do they provide sufficient tactile distinctions to enhance their use."  '516 Patent at 4:14-17.  "Nor do current systems provide an integrated auto-close feature in conjunction with other functions provided on a multi-function wall station.  And these systems do not provide both the ability to easily disconnect and/or adjust the timing of the auto-close feature."  '516 Patent at 4:14-17.  Finally, conventional barrier operator systems were deficient in that they failed to provide an auto-close feature that could only be enabled if a keyless entry transmitter or other remote transmitter is also linked to the barrier operating system.  '516 Patent at 4:22-24.

76.    The claimed inventions of the '516 Patent technologically improves barrier operator systems by providing a "complete and integrated functional wall station that is ergonomically designed and efficient in use and operation."  '516 Patent at 4:23-27.  They do so by providing "a radio frequency controlled wireless wall station for controlling the operational parameters of a door or gate operator that contains a plurality of switches or buttons to provide a plurality of functions and features."  '516 Patent at 4:54-56.  These features include for instance, "an auto-close feature wherein the auto-close feature is provided with an operator-set or a user-adjustable time period for allowing a door or barrier to remain open for a period of time prior to beginning of closure of the barrier."  '516 Patent at 5:6-8.  The auto-close feature may also include the function of "permitting the auto-close feature to only be enabled if a keyless transmitter is taught to the operator system a blocking feature such that a wall station transmitter is the only transmitter recognized by the operator system," or only enabling "if a signal is previously received from a remote transmitter or a keyless transmitter."  '516 Patent at 4:5:10-18.  The features may

also include blocking of all other wireless or remote transmitters external to the operator such that a wall station transmitter is the only transmitter recognized by the operator system.  '516 Patent at 5:9-12.  And to assist in inadvertently triggering the wrong feature, the '516 Patent claims a "cover that is used to conceal the certain plurality of buttons and wherein the cover is movable in the concealing position to allow for actuation of at least one of or a selected number of the concealed buttons."  '516 Patent at 5:27-30.

77.     The claims of the '516 Patent are directed to inventive concepts that, alone or in combination, were unconventional and not well known or routine.  For example, claim 10 recites "[a]n operator system for moving a barrier comprising:" "a motor", "an operator for controlling operation of said motor", "a wall station", "an open/close switch", and "an auto-close/blocking selector switch, wherein if said selector switch is in an auto-close mode, said operator automatically closes the barrier if left open for a predetermined period of time, and wherein if said selector switch is in a blocking mode, said operator is precluded from receiving operational signals from any source other than said wall station."  '516 Patent at Claim 10.  Unlike the prior art, which failed to provide these features at all, or failed to provide them in one central location with an efficient user interface, the '516 Patent advantageously provides a "complete and integrated functional wall station that is ergonomically designed and efficient in use and operation."  '516 Patent at 4:23-27.

78.     In each claim, the claimed elements in combination result in a particular barrier operating system that is implemented in an unconventional and non-trivial manner, and which require new and technologically improved devices—wall stations, as demonstrated in Figures 1-3 of the '516 Patent.  The claimed elements are not merely generic barrier operator components, but require an inventive barrier operator control system that is not standard and cannot be purchased

off-the-shelf. These systems were not well understood or routine. Each claim combines the claimed elements in an unconventional way to solve problems related to unauthorized access and safe exit through a garage door within a predetermined period of time, designed in an ergonomically efficient way

79.     Even Chamberlain has recognized the benefits provided by systems practicing one or more claims of the '516 Patent. As shown in Chamberlain's "Accessory Compatibility Chart," Chamberlain includes its auto-close functionality, which it calls "Timer-to-Close" in a number of its systems. *See* **Exhibit 30,** Accessory Compatibility Chart, available at https://p.widencdn.net/nkm2rb/CX3131 ("Timer-to-Close automatically closes the garage door after a pre-programmed number of minutes."). Chamberlain combines that feature in various Accused Products with a "Lock button" which Chamberlain also touts: "The Lock button temporarily deactivate remote control functionality, so you can rest assured the opener will not respond to any commands from a remote control while you're away." https://support.chamberlaingroup.com/s/article/How-to-Operate-the-Multi-Function-Door-Control-1484145520003.

80.     Chamberlain's own patents cite to the '516 Patent. For example, U.S. Patent Nos. 9,143,009, 7,679,301, and 7,339,336, as well as U.S. Patent Pub. Nos. 20080186129, 20080180050, 20060108876, and 20050156547, assigned to Chamberlain, include the '516 Patent in their references cited during prosecution.

81.     Chamberlain has directly infringed at least claim 10 of the '516 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271. The infringing products include, but are not limited to, LiftMaster™ Model 8500. The infringement remains ongoing.

82.     Attached hereto as **Exhibit 20** is an exemplary claim chart detailing representative infringement of claim 10 of the '516 Patent by Chamberlain.

83.     In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the '516 Patent.

84.     As a consequence of Chamberlain's infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

85.     On information and belief, Chamberlain's infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the '516 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement.

## CLAIM 4 - INFRINGEMENT OF U.S. PATENT NO. 7,180,260

86.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 85 above as if specifically set forth herein.

87.     The '260 Patent is entitled "Barrier Operator Controller With User Settable Control Limits When Entrapment Device Present," issued on February 20, 2007, to inventors Larry D. Murphy and Ulrich Theile.  The '260 Patent expires on June 30, 2025.  The '260 Patent issued from U.S. Patent App. Ser. No. 11/358,016, filed on February 21, 2006, and was previously published as U.S. Patent Pub. No. 2007/0001637 on January 4, 2007.  The '260 Patent claims priority to U.S. Patent App. Ser. No. 11/171,798, filed June 30, 2005.

88.     A copy of the '260 Patent is attached as **Exhibit 4**.

89.     Overhead Door Corporation is the owner, by valid assignment, of the entire right, title, and interest in and to the '260 Patent.  The assignment is recorded at the United States Patent

and Trademark Office at Reel/Frame 016352/0163 and 016352/0239.  The '260 Patent is valid, enforceable, and is currently in full force and effect.

90.     The '260 Patent is part of Overhead Door's continued effort to provide safer barrier operating systems.  The '260 Patent is a technological improvement to moveable barrier control and communication systems – it allows "means providing for the user of the operator to set certain control limits, such as maximum forces exerted by the operator when opening and closing the barrier, as long as an external entrapment device is present and operably connected to the operator controller."  *See, e.g*., '260 Patent at 1:40-44.

91.     As the '260 Patent explains there are situations where a user may want to increase the force of the barrier operating system, for instance if a greater force is required due to misalignment of the guide tracks, wear and tear on the operator, or changes in the counterbalance structure.  '260 Patent at 5:49-60.  Conventional barrier operator systems lacked the capability for allowing a user to increase these control settings, such as force limits, without also compromising the safety features of the barrier operator system.  Given this problem, the '260 Patent provides a technical solution to the problem associated with barrier operating systems becoming less safe as a user increased control limit values.  The '260 Patent provides specific solutions to this technical problem associated with barrier operating systems by disclosing a system where control limit values are automatically set to default values if an entrapment device is not detected.  '260 Patent at Abstract.  Further, once an entrapment device is detected, the system will allow the user to alter the control limits.  '260 Patent at Abstract.  The result is an innovative system that allows a user to customize control limit values (such as the speed and force at which the garage door closes) while the entrapment system is engaged, with the added safety of default values while the entrapment system is not engaged.  '260 Patent at Abstract.

92.     The claims of the '260 Patent further require limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well known or routine.  In claim 1 for instance, the claimed elements in combination are not conventional, well understood, or routine.  For example, the claim requires a controller that is "responsive to user input of one of barrier opening and closing force limit values when said external entrapment device is connected to said controller to adjust said at least one of said force limits exerted on said barrier by said motor when moving said barrier between said open and closed positions."  '260 Patent at Claim 1.  As explained above, this allows the user to adjust force limit values when an entrapment device is operatively connected.  '260 Patent at Abstract.  This represents a technological improvement over then-conventional systems which either failed to provide a user with the ability to modify the force limit values, or required the user to disengage the entrapment device before allowing the user to modify such settings.

93.     In each claim, the claimed elements in combination result in a particular barrier operating system that is implemented in an unconventional and non-trivial manner, and which require new and technologically improved devices, as demonstrated in Figures 2 and 3 of the '260 Patent.  The claimed elements are not merely generic barrier operator components, but in combination require inventive control limit safety protocols that were not standard in traditional barrier operating systems.  These systems were neither well understood nor routine.  Each claim combines the claimed elements in an unconventional way to solve problems related to the need to modify control limits without sacrificing safety associated with conventional barrier operator systems.  Even Chamberlain has recognized the benefits provided by systems practicing one or more claims of the '260 Patent, explaining that its Accused Products require the user to customize

force limit values *after* connecting the entrapment device.  *See* **Exhibit 33**, LiftMaster 8500 Owner's Manual, at 20

94.     Chamberlain has directly infringed at least claim 1 of the '260 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.  The infringing products include, but are not limited to, LiftMaster 8500.  The infringement remains ongoing.

95.     Attached hereto as **Exhibit 21** is an exemplary claim chart detailing representative infringement of claim 1 of the '260 Patent by Chamberlain.

96.     In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the '260 Patent.

97.      As a consequence of Chamberlain's infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

98.     On information and belief, Chamberlain's infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the '260 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement.

## CLAIM 5 - INFRINGEMENT OF U.S. PATENT NO. 7,315,143

99.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1  through 98 above as if specifically set forth herein.

100.     The '143 Patent is entitled "Operating System Utilizing A Selectively Concealed Multi-Function Wall Station Transmitter With An Auto-Close Function For A Motorized Barrier Operator," issued on January 1, 2008, to inventors Willis J. Mullet, James S. Murray, and David B. Davies.  The '143 Patent expires on February 18, 2024.  The '143 Patent issued from U.S. Patent

App. Ser.  No. 10/588,569, filed on February 4, 2005, and was previously published as U.S. Patent Pub. No. 2007/0188129 on August 16, 2007.  The '143 Patent claims priority to U.S. Patent App. Ser. No. 10/773,479, filed on February 6, 2004. .

101.    A copy of the '143 Patent is attached as **Exhibit 5**.

102.    GMI Holdings Inc is the owner, by valid assignment, of the entire right, title, and interest in and to the '143 Patent.  The assignment is recorded at the United States Patent and Trademark Office at Reel/Frame 04033/0990.  The '143 Patent is valid, enforceable, and is currently in full force and effect.

103.    The '143 Patent generally relates to an operating system which utilizes a multi-functional wall station for a moveable barrier which provides for an auto-close mode for automatically closing a door after a predetermined period of time.  The system may further provide for a blocking mode for preventing remote transmitters from opening a door.  The system may further provide selective concealment of certain switches or buttons which are not commonly used in day-to-day operation of the wall station.

104.    The '143 Patent generally is related to the '516 Patent discussed above, which technologically improves barrier operator systems by providing key functionality in a centrally located user-friendly interface.  The '143 Patent further technologically improves barrier operator systems by providing "an auto-close blocking selector button which, if enabled, precludes the operator from receiving operational signals from any source other than the wall station."  '143 Patent at 6:1-4.  As discussed in the specification, "[t]he radio frequency blocking feature is for when a user is on vacation and desires that no external or remote transmitters allow for operation of the movable barrier."  '143 Patent at 8:48-51.

105.    The claims of the '143 Patent further require limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well known or routine.  For example, claim 1 recites "[a]n operator system for moving a barrier comprising:" "a motor", "an operator for controlling operation of said motor", "a wall station", "an open/close switch", and "an auto-close/blocking selector switch which, if enabled in a blocking mode, precludes said operator from receiving operational signals from any source other than said wall station."  '143 Patent at Claim 1.

106.    In each claim, the claimed elements in combination result in a particular barrier operating system that is implemented in an unconventional and non-trivial manner, and which require new and technologically improved devices—wall stations, as demonstrated in Figures 1-3 of the '143 Patent.  The claimed elements are not merely generic barrier operator components, but in combination require an inventive barrier operator control system that is not standard and cannot be purchased off-the-shelf.  These systems were not well understood or routine.  Each claim combines the claimed elements in an unconventional way to solve problems related to unauthorized access and signal interference.

107.    Even Chamberlain has recognized the benefits provided by systems practicing one or more claims of the '143 Patent.  As shown in Chamberlain's "Accessory Compatibility Chart," Chamberlain includes its auto-close functionality, which it calls "Timer-to-Close" in a number of its systems.    *See*  **Exhibit 30,**  Accessory Compatibility Chart, available at https://p.widencdn.net/nkm2rb/CX3131 ("Timer-to-Close automatically closes the garage door after a pre-programmed number of minutes.").  Chamberlain combines that feature in various Accused Products with a "Lock button" which Chamberlain also touts:  "The Lock button temporarily deactivate remote control functionality, so you can rest assured the opener will not

respond to any commands from a remote control while you're away."
https://support.chamberlaingroup.com/s/article/How-to-Operate-the-Multi-Function-Door-Control-1484145520003.

108.    Chamberlain's own patents cite to the '143 Patent.  For example, U.S. Patent Nos. 9,143,009 and 8,587,404, as well as U.S. Patent Pub. Nos. 20100242369 and 20080186129, assigned  to Chamberlain, include the '143 Patent in their references cited during prosecution.

109.    Chamberlain has directly infringed at least claim 2 of the '143 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.  The infringing products include, but are not limited to, LiftMaster 8500.  The infringement remains ongoing.

110.    Attached hereto as **Exhibit 22** is an exemplary claim chart detailing representative infringement of claim 2 of the '143 Patent by Chamberlain.

111.     In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the '143 Patent.

112.     As a consequence of Chamberlain's infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

113.    On information and belief, Chamberlain's infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the '143 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement.

## CLAIM 6 - INFRINGEMENT OF U.S. PATENT NO. 7,143,804

114.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 113 above as if specifically set forth herein.

115.     The '804 Patent is entitled "Overhead Door Locking Operator with Remote Light Assembly," issued on December 5, 2006, to inventors Willis J. Mullet and Donald Bruce Kyle. The '804 Patent expired on April 13, 2020.  The '804 Patent issued from U.S. Patent App. Ser. No. 11/041,840, filed on January 24, 2005, and was previously published as U.S. Patent Pub. No. 2005/0126717 on June 16, 2005.  The '804 Patent is a continuation of application No. 10/444,018, filed on May 22, 2003, now Pat. No. 6,851,465, which is a division of application No. 09/710,071, filed on November 10, 2000, now Pat. No. 6,568,454, which is a continuation-in-part of application No. 09/548,191, filed on April 13, 2000, now Pat. No. 6,561.255.  The '804 Patent is terminally disclaimed over U.S. Patent No. 6,851,465.

116.     A copy of the '804 Patent is attached as **Exhibit 6**.

117.     Overhead Door Corporation is the owner, by valid assignment, of the entire right, title, and interest in and to the '804 Patent, including the right to sue for past infringement thereof. The assignment is recorded at the United States Patent and Trademark Office at Reel/Frame 040333/0990.

118.     The '804 Patent generally relates to an overhead door operating system with an operator motor assembly, operator transmitter, and remote assembly. The remote assembly is capable of "assuming an on condition," *i.e.*, turning on, when it receives a wireless signal from the operator transmitter.  The operator transmitter sends the wireless signal during an operating cycle of the operator motor assembly.  *See* '804 Patent at 18:45-61.  The remote assembly is defined in claim 5 as being a light source.  *See also* '804 Patent at 18:56-62 ("Upon receipt of the signal S,

sensing element 613 assumes an on condition effecting illumination of lightbulb."); *id.* at Figs. 1, 16, and 17.

119.    The claimed inventions of the '804 Patent technologically improves barrier operator systems by providing an operator "wherein the number of component parts is greatly reduced from conventional operators such as to provide improved reliability and quicker and easier installation." '804 Patent at 5:9-13.  For example, as recited in Claim 5, providing a "light source" that is turned on by a "wireless signal,"  improves upon existing operator systems that relies on conventional hard-wired signals.

120.    Chamberlain has remote light associated with its 8500W jackshaft opener that turns on as a result of a wireless signal, namely the Chamberlain and Liftmaster MyQ Remote Light ("MYQLED1").

121.    The claims of the '804 Patent further require limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well known or routine.  For example, claim 1 recites "an operator motor assembly selectively opening or closing the door," "an operator transmitter located with said operator motor assembly," the "operator transmitter is activated during an operating cycle of said operator motor assembly and which transmits a wireless signal," "a remote assembly in electrical communication with a power supply," the "remote assembly receiving and assuming an on condition when said wireless signal is received." '804 Patent at Claim 1.

122.    In each claim, the claimed elements in combination result in a particular barrier operating system that is implemented in an unconventional and non-trivial manner, and which require new and technologically improved devices—operator motor assemblies, as demonstrated in Figures 1, 16, and 17 of the '804 Patent.  The claimed elements are not merely generic barrier

operator components, but in combination require an inventive barrier operator control system that is not standard and cannot be purchased off-the-shelf. These systems were not well understood or routine. Each claim combines the claimed elements in an unconventional way to solve problems related to unauthorized access and signal interference.

123.    Chamberlain has directly infringed at least claim 1 of the '804 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271. The infringing products include, but are not limited to, LiftMaster™ Model 8500W. The infringement remains ongoing.

124.    Attached hereto as **Exhibit 23** is an exemplary claim chart detailing representative infringement of claim 1 of the '804 Patent by Chamberlain.

125.    In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the '804 Patent.

126.    As a consequence of Chamberlain's infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

127.    On information and belief, Chamberlain's infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the '804 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement

## CLAIM 7 - INFRINGEMENT OF U.S. PATENT NO. 7,956,718

128.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 127 above as if specifically set forth herein.

129.    The '718 Patent is entitled "Remote Control And Monitoring Of Barrier Operators With Radio Frequency Transceivers," issued on June 7, 2011, to inventors Larry D. Murphy, Brian

M. Yackey, and Grant B. Carlson.  The '718 Patent expires on December 16, 2024.  The '718 Patent issued from U.S. Patent App. Ser. No. 60/636,513, filed December 16, 2004.

130.    A copy of the '718 Patent is attached as **Exhibit 7**.

131.    Overhead Door Corporation is the owner, by valid assignment, of the entire right, title, and interest in and to the '718 Patent, including the right to sue for past infringement thereof.  The assignment is recorded at the United States Patent and Trademark Office at Reel/Frame 017092/0186.

132.    The '718 Patent is part of Overhead Door's continued effort to advance wireless interfacing in barrier operating systems.  That technology is embodied in the Aladdin Connect technology, which has been available since at least 2015.  As noted in claim 1 of the '718 Patent, the subject matter involves an "improvement" to wireless barrier operator systems which is "characterized by" an ability to switch "between a power consumption mode and a low power consumption mode."  In various claims of the '718 Patent, the system includes an "obstruction detector unit," which coordinates the detection of the presence of an obstruction in the doorway.  '718 Patent at 6:15-19.  To enhance said unit's life and to conserve power, the obstruction detector unit switches from a "low power" mode to a "high power mode" when it receives a signal that the door is about to open or close.  *Id*. at 6:18-44 & claim 24.

133.    The '718 Patent provides a specific technological solution to the technology-specific problem associated with wireless barrier operating systems: because many aspects of the system are wireless, they tend to be battery operated, which risks placing aspects of the system at risk of shutdown at inopportune times and/or would require excess power consumption to maintain.  The '718 Patent provides specific technological solution to said specific technical problems. '718 Patent at 7:39-45 ("As with the detector unit 90, the devices or units 110 and 115

may include detector or sensor devices which may be maintained in a low power or no power consumption status until a signal is provided to change the state of the device, which may occur when one of the devices 104 or 106 is moved toward or from a stored position for example.").

134.    Specific claims recite a solution wherein wireless transceivers allow bi-directional transmission of information between a wall station, an operator unit, and an obstruction detector unit wherein the system minimizes power consumption by utilizing a low power mode until a status signal is received indicating that the door is about to open or close.

135.    The claims of the '718 Patent further require limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well known or routine.   In claims 18 and 24 for instance, the claimed elements in combination are not conventional, well understood, or routine.  For example, both claims 18 and 24 require an operator, a "base controller" with a base transceiver, and a "remote controller" with a remote transceiver, and "at least one of [a] status indicating unit and [an] obstruction detection unit including an RF transceiver." '718 Patent at Claims 18 and 24.  Claim 18 states that "said transceivers [are] operable to transmit signals to at least one of said base transceiver and said remote transceiver indicating a status of said barrier" being one of "an open position, moving toward an open position, a closed position, moving toward a closed position and obstruction detected."  '718 Patent at Claim 18. Claim 24 states that the RF transceiver is "operable to transmit signals to [the] base transceiver indicating one of a status of [the] barrier and an obstruction detected."  *Id.*  Further, Claim 18 requires "said obstruction detection unit includes control means responsive to a signal from at least one of said base transceiver and said remote transceiver for changing a power consumption mode of the obstruction detection unit."   And Claim 24 requires the RF transceiver be "capable of

changing from a low power consumption state to a higher power consumption state upon receiving a signal from at least one of said base transceiver and said remote transceiver." *Id.*

136.    As discussed above, this represents a technological improvement over existing systems because, *inter alia*, the inclusion of the three transceivers contemplated in claims 18 and 24 allows for the capability to monitor door status while operating in high and low power modes for enhanced energy conservation.

137.    In the asserted claim, the claimed elements in combination result in a particular barrier operating system that is implemented in an unconventional and non-trivial manner, and which require new and technologically improved devices—low cost low power transceivers, as demonstrated in Figures 2 and 4 of the '718 Patent.  The claimed elements are not merely generic barrier operator components, but require inventive low power, low cost transceivers that were not standard in traditional barrier operating systems and utilizing them in a particular way to conserve energy.  These systems were neither well understood nor routine.  Each claim combines the claimed elements in an unconventional way to solve problems related to limited range of control and status indication associated with conventional barrier operator systems.

138.    Chamberlain's own patents cite to the '718 Patent.  For example, U.S. Patent Nos. 9,587,420, 8,665,065, and 8,314,509, as well as U.S. Patent Pub. Nos. 20170002595, 20120255231, and 20110074331  assigned  to Chamberlain, include the '718 Patent in their references cited during prosecution.

139.    Chamberlain has directly infringed at least claim 18 of the '718 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.  The infringing products include, but are not limited to, LiftMaster™ Model C205 with MyQ Smart Garage Hub.  The infringement remains ongoing.

140.     Attached hereto as **Exhibit 24** is an exemplary claim chart detailing representative infringement of claim 18 of the '718 Patent by Chamberlain.

141.     In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the '718 Patent.

142.      As a consequence of Chamberlain's infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

143.     On information and belief, Chamberlain's infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the '718 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement.

## CLAIM 8 - INFRINGEMENT OF U.S. PATENT NO. 8,410,895

144.      Plaintiffs incorporate by reference the allegations set forth in paragraphs 1  through 143 above as if specifically set forth herein.

145.      The '895 Patent is entitled "Remote Control And Monitoring Of Barrier Operators With Radio Frequency Transceivers," issued on April 2, 2013, to inventors Larry D. Murphy, Brian M. Yackey, and Grant B. Carlson.  The '895 Patent expires on December 16, 2024.  The '895 Patent issued from U.S. Patent App. Ser.  No. 13/152,970, filed on June 3, 2011, and was previously published as U.S. Patent Pub. No. 2011/0234367 on September 29, 2011.  The '895 Patent claims priority to U.S. Patent App. Ser.  No. 11/301,584, filed December 13, 2005, which issued as the '718 Patent, and to U.S. Patent App. Ser. No. 60/636,513, filed December 16, 2004.

146.      A copy of the '895 Patent is attached as **Exhibit 8**.

147.    Overhead Door Corporation is the owner, by valid assignment, of the entire right, title, and interest in and to the '895 Patent, including the right to sue for past infringement thereof. The assignment is recorded at the United States Patent and Trademark Office at Reel/Frame 026388/0242.

148.    The '895 Patent is part of Overhead Door's continued effort to advance wireless interfacing in barrier operating systems.  Embodied in the Aladdin Connect technology, which has been available since 2015, the '895 Patent is a technological improvement to moveable barrier communication systems – it allows "information and commands" to be "communicated between an operator base controller and remote control and monitoring devices" by including a "low power consumption RF transceiver" in both the operator base controller and the remote control unit.  *See, e.g.*, '895 Patent at 2:4-28.

a.    The asserted claims of the '895 patent recite limitations that, alone or in combination, are directed to inventive concepts that were unconventional and not well known or routine.  The recited method steps  include shifting components into a low power mode state when not in use.  '895 Patent, at 7:45-51 ("As with the detector unit 90, the devices or units 110 and 115 may include detector or sensor devices which may be maintained in a low power or no power consumption status until a signal is provided to change the state of the device, which may occur when one of the devices 104 or 106 is moved toward or from a stored position for example.") Thus, the result of the '895 invention is a system where a user can both determine the status of their garage door system, and operate that system, and its corresponding components, from anywhere, while conserving energy.

149.    Chamberlain has directly infringed at least claim 17 of the '895 Patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.  The infringing products

include, but are not limited to, LiftMaster™ Model C205 with MyQ Smart Garage Hub and Chamberlain Model B970. The infringement remains ongoing.

150. Attached hereto as **Exhibit**s **25-26** are exemplary claim charts detailing representative infringement of claim 17 of the ’895 Patent by Chamberlain.

151. In addition to its direct infringement, Chamberlain has been and is now indirectly infringing by way of inducing infringement and/or contributing to the infringement of one or more claims of the ’895 Patent.

152. As a consequence of Chamberlain’s infringement, Plaintiffs are entitled to recover damages adequate to compensate it for the injuries complained of therein, but in no event less than a reasonable royalty.

153. On information and belief, Chamberlain’s infringement is willful, deliberate, and intentional because it has had actual and/or constructive knowledge of the ’895 Patent before the filing of this Complaint, and Chamberlain has no good faith belief in non-infringement

* * *

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully that this Court enter judgment in Plaintiffs’ favor against Defendant and issue an order that includes:

A. A judgment in favor of Plaintiffs that Defendant has infringed, either literally and/or under the doctrine of equivalents, each of the Asserted Patents;

B. A preliminary and/or permanent injunction prohibiting Defendant from further acts of infringement of the ’935, ’345,’516, ’260, ’143, ’804, ’718, and ’895 Patents;

C.     A judgment and order requiring Defendant to pay Plaintiffs their damages, costs, expenses, and pre-judgment and post-judgment interest for Defendant's infringement of the Asserted Patents;

D.     A judgment and order requiring Defendant to provide an accounting and to pay supplemental damages to Plaintiffs, including without limitation, pre-judgment and post-judgment interest;

E.     A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Plaintiffs their reasonable attorneys' fees against Defendant; and

F.     Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: July 6, 2020                    Respectfully submitted,

                                       LATHAM & WATKINS LLP

                                       */s/ S. Giri Pathmanaban*
                                                S. Giri Pathmanaban
                                                SBN: 24074865
                                                140 Scott Drive, Menlo Park, CA
                                                Telephone: 650-470-4851
                                                Facsimile: 650-463-2600

                                                Kenneth G. Schuler
                                                IL Bar No. 6226036
                                                330 N. Wabash Avenue, Suite 2800
                                                Chicago, IL 60611
                                                Telephone: (312) 876-7700

Facsimile: (312) 993-9767

FOLEY & LARDNER LLP
  Kenneth R. Glaser
  SBN: 07999000
  2021 McKinney Avenue, Suite 1600
  Dallas, TX 75201
  Telephone: (214) 999-3000
  Facsimile:  (214) 999-4667

**ATTORNEYS FOR PLAINTIFFS
OVERHEAD DOOR CORPORATION
AND GMI HOLDINGS INC.**